Mr. Lucci, when you're ready. May it please the court, the board's decision on the issue of obviousness lacks evidentiary support and it's also inconsistent with the evidence of record which indicates that those claim methods would have worked. The sole reference upon which the rejection is based, the Corotolo patent, is deficient in three critical respects. Let me interrupt you, if I could, right at the beginning because this goes to the core of what's troubling me about this case. When you say would have worked, what do you mean by would have worked? There's nothing in the patent that I can see that defines a level of efficacy that suggests how we would determine whether it works or not other than simply saying it distributes the drug throughout the body of someone who receives it. Well it certainly discusses that, your honor, but it also talks about treating people with diabetes and so the standard for whether or not it works is whether or not it mitigates the effects of diabetes and controls the blood sugar levels of the patients. But we know that glipizine does those things and we know that from Corotolo, which refers to using the method in Corotolo to distribute glipizine, what is it that you have added in your patent to that other than saying take the distribution method of Corotolo and give it to a person? Well, your honor, if I may point, Corotolo doesn't really disclose a method of treatment using glipizine. It doesn't call it that, but it says this is a method of distributing glipizine, presumably to a person. Your honor, and this is an important point, the disclosure in Corotolo is much more generic. What Corotolo discloses, as indicated beginning with its title, is a novel drug delivery platform that uses lyotrophic crystals. One of which drug that can be distributed in that system is identified as glipizine, right? Yes, your honor. It's one of a long list of drugs, but glipizide is disclosed among them. Glipizide, I guess it is, right? It is, your honor, yes. Not glipizine, right? Okay, glipizide. But it is disclosed among them. But Corotolo talks about that novel drug delivery platform that it has only in an in vitro context with respect to glipizide. Only in the context of a lab bench under artificial conditions. It doesn't talk about putting it into a patient, how it should be put into a patient, for what purpose it should be put into a patient. It has no reference to diabetes. It has no reference to hypoglycemia or any other related condition. It seems to be a test situation that they disclosed in the context of a laboratory bench to demonstrate that this novel and broadly applicable delivery platform would have some properties that would appear to be useful. What evidence do you have? Let me just move you to a different issue. What evidence do you have that Pfizer's Glucotrol was based on your invention, Kaczynski's invention? Your honor, the evidence on that point, which came up in the context of rehearing, was the press release. That issue about— That's all you would have? Why is that all that you put in? Why didn't you have a declaration? Why didn't you have something that—a joint venture agreement or something that you could have—you know, a Google search seems to be a pretty weak effort to make a case. Your honor, I think in the context of the way that issue, of the relationship between Pfizer and all those arose, I think that's the reason we put it in that way. It was only in the board's decision that that relationship— She was rejecting the opinion of your expert, but she also specifically mentioned Pfizer and that relationship. There was a mention of Pfizer, your honor, but I think in context it wasn't clear what the examiner was relying upon there. The weather, about the motivation of Pfizer, what the examiner latched onto was—the examiner didn't raise the issue of Pfizer on her own. It was only in responding to statements that Dr. Lebovitz made, in stating what he and his colleagues had communicated to Pfizer about the dangers of administering glipizide in a matter consistent with what was later claimed by Dr. Kucinich. Okay, so even if it doesn't come up until the motion for rehearing, why didn't you put in more than just a Google search? Your honor, we felt constrained in an evidentiary sense in raising this in rehearing to put in evidence. We put in evidence that would be publicly available, but we didn't believe it to be appropriate in the context of rehearing to come in with a declaration and even a more detailed discussion of that relationship. So are you saying that this Pfizer glucotrol is an also product? Yes, your honor. This is an issue that isn't in the record, but it's a matter of public record. If you look in the Orange Book, under Glucotrol XL, to find out what patents are listed for the patent right now, the 454 patent, that's the patent that's listed in the Orange Book. So the relationship between Pfizer and also with respect to Glucotrol XL is very clear. And it wasn't clear from what the examiner had teed up for us, your honor, that the nature of the relationship between also and Pfizer was in question, much less that it would be relied upon in an adverse nature the way the board did in its decision. Well, if your purpose was to rebut a prima facie case, I know you argue that they didn't have a prima facie case, but assuming there was, I mean, if the purpose of the affidavit was to rebut a prima facie case, why didn't, if also is really Glucotrol, why didn't you put in evidence of commercial success or anything relating to Glucotrol? Well, your honor, because of the nature of the rejection we were facing, the rejection was based on obviousness in view of Curatolo. And what the arguments addressed were dosage forms of the type disclosed in Curatolo. Paragraph 21 of Dr. Lebovitz's declaration doesn't reference Curatolo itself, but it acknowledges with respect to a sustained release dosage form for glipizide, we had misgivings about whether it would work, and we in fact thought it would endanger the health of the patient. That's at paragraph 21. So we were addressing the rejection that was being framed at that time, which was solely obviousness in view of Curatolo. And that's the reason why we didn't get into commercial success. We felt very confident in the arguments that we had with respect to Curatolo. Okay, so what you want would be for us to remand, for the board to further consider the relationship between ALSA and Pfizer? Your honor, actually, our preference would be that you would find the rejection that we faced, that we addressed on appeal, and are appealing now, to be improper. We have the claims rejected in view of Curatolo solely. We have the board ignoring, essentially ignoring evidence of records in the form of Dr. Lebovitz as to what people of ordinary skill in the art thought at the time of our mention. So we believe the appropriate thing for this court to do would be to reverse that rejection. Barring that, if you thought there was some reason that you felt you couldn't reverse that rejection, a remand would be what we would see. We touched on this a bit, but the only evidence of record of what people of ordinary skill in the art would have thought at the relevant point in time is in fact Dr. Lebovitz's declaration. And he does establish that those of ordinary skill at the relevant time would not have thought the sustained release dosage form administered to a patient would work to control the symptoms of diabetes. And also, because of the prior experience the doctors had with a related drug, Glyburide, that the sustained release administration of Glipizide to a patient would actually endanger the patient's health because of the uncontrolled way that it was thought that it would affect the blood glucose levels. What is there in your specification that suggests that that was incorrect? There's nothing of a scientific underlying nature of the mechanism of how it affects things, but what's in our specification, Your Honor, is a discussion of actually taking and there's a discussion of a once a day sustained release administration of Glipizide to a patient. That's what's in our specification. And that was contrary to the thinking at the relevant point in time as to whether or not that type of method would actually work in a patient and not in fact endanger the patient's health. It was later proven through a number of studies, in fact the commercial marketing of that product, that that was in fact correct. And that's the nature of our disclosure that we have. But you had not ascertained that at the time, or at least you didn't say anything in your spec. Well, the successful use of these methods was discussed in the spec. There wasn't scientific test data. It hadn't been done in vivo, had it? I don't believe it had, Your Honor. I mean, nothing in the spec suggests that there were any in vivo testing. I believe that's correct, Your Honor. Subsequent to the filing of patent, there was much more scientific investigation and validation of what was disclosed in the patent. That is in fact the case. One thing here, as I mentioned, is Corotolo discloses simply a test that was done on a laboratory bench. It fails to disclose how, if at all, that testing relates to actual use in a human. Much has been made of the fact that there's an in vitro test, a lab bench test, that involves 23 hours or so. But there's no indication in the record of how that 23 hours would have been viewed by someone of ordinary skill in the art in terms of actual use in a patient. There's no disclosure, for example, of whether that 23-hour period was believed to be relevant of once-a-day administration, once every 24 hours, or somehow what was applicable to a lab bench on 23 hours was applicable to once every four hours, or even once every 40 hours. There's simply no disclosure on that point. There's an evidentiary gap between Corotolo and the claim methods that the director has failed to bridge. And moreover, there's the Lebovitz Declaration standing in the way, the only evidence of record indicating what those of ordinary skill would have understood and believed at the relevant point in time. I see that I'm into my rebuttal time. If there's further questions, if not, I'd like to reserve my time. Very well. Thank you. Thank you. We'll hear from the solicitor's office. Ms. Ledger. Good morning, Your Honors. May it please the Court. Claim one is broad. It claims a method for treating high blood sugar with glipizide in amounts of 2 to 750 milligrams in a once-a-day osmotic dosage form. Corotolo teaches, administrating a controlled release osmotic dosage form, glipizide that falls in the amount claimed. And it was known in the art that glipizide treats high blood sugar. Thus, the only feature of claim one that's not explicitly taught by Corotolo was the once-a-day dosing. And the board found that in light of its teaching, that over a range of 23 hours, that one of ordinary skill in the art would know how to make a once-a-day dosing of glipizide under Corotolo. Now, Kaczynski argues that there's two gaps in Corotolo. He says it doesn't disclose administration of glipizide to patients, and it doesn't claim any methods of treatment. But Kaczynski's incorrect on both points. Corotolo repeatedly teaches to administer its controlled release dosage form to patients. And that dosage form in 10 out of the 11 examples is glipizide. And I can send the Court, there's many references within Corotolo, but I'll send the Court to a few. A491, Column 1, Lines 15 to 18, A494, Column 8, Lines 31 to 35, A496, Column 1, Lines 11 to 14. You're going a little too fast for me. The other judges may write faster than I do. Could you start over with your list? 491. 491. Column 1, Lines 15 to 18. All right. A494, Column 8, Lines 31 to 35. And A496, Column 1, Lines 11 to 14. So in numerous places, Corotolo tells you to administer its controlled release dosage form to patients. Kaczynski also argues that Corotolo doesn't claim any methods of treatment, but he does. If you look at his claims, and those are on A499, Claims 15, 16, 17, and 19 are all claims to method of treatment. Kaczynski's next argument is that the Lebovitz Declaration would rebut the prima facie case, but it doesn't. They put in the Lebovitz Declaration to talk about what the state of the art was, but he doesn't address Corotolo at all. And so he's not adequately describing the state of the art. Corotolo was already telling people to administer glipizide in a controlled release formulation to patients. But the mere fact that it might be in a controlled release form doesn't necessarily mean that it would be efficacious in treating people with diabetes, correct? Well, it was known to lower blood sugar. So it was known to do that. And Corotolo is telling you to use it for that. Right, but the whole point of using glipizide is to control the spikes in blood sugar. You can't just lower blood sugar. I mean, that was the whole point, is that when someone eats, the spike goes up. When their sugar drops, it goes down. I mean, the mere fact that you can give someone a controlled release doesn't mean that it's something that would be medically sound to do. But Kaczynski didn't figure that out either. He doesn't have any in vivo results either. He does the same thing. He just has a controlled release glipizide and says to use it. So there's no advance over Corotolo over what Kaczynski was doing. And, you know, obviously Pfizer wouldn't have been trying to make a controlled release dosage form if they didn't think it was going to have some efficacy in the market. I don't think pharmaceutical companies pursue drugs that they don't think are going to work. Well, this gets at the key question for me, at least, that's troubling me about this case. Suppose you have – let's just take a hypothetical. You have an invention in the prior art of a new syringe which uses a much narrower needle. It's much less invasive than the standard syringes. And then someone comes along and says, okay, I now claim a method of delivering drugs to a human using that syringe. And five years later, it turns out that after a lot of research and epidemiological studies, that the use of that syringe to deliver certain drugs actually makes the drugs, for some reason that's not entirely clear, more efficacious than you would have expected. Does that fact discovered later, not found within the specification, render that patentable over the prior art? Well, I think in your honors example, there are some unexpected results. There are. And Kaczynski – Unexpected by the patentee at the time of the patent and obviously under the prior art. Kaczynski specifically says in his reply brief that he's not relying on unexpected results. And what the examiner found was that Curatalo's sustained release dosage form and Kaczynski's sustained release dosage form had very similar release rates. And if Kaczynski wanted to show unexpected results, he could have tried to show that there was something about his sustained release that was different than Curatalo. And if he had made a showing of unexpected results, the board would have considered that. Well, what would you do with my case? I think you would have to look at what those unexpected results were. Well, the unexpected results are, let's say, that the drug, when administered in what would amount to a smaller volume in a particular part of the body, ends up being absorbed more quickly as more efficacious. I think you'd have to look at whether one of ordinary skill in the art would have expected that to happen. You're saying they wouldn't. I'm saying they wouldn't if it came as a big surprise to everyone, including the patentee. The question is, does that later unexpected results inure to the benefit of the patentability of the patent? And let me direct you without – here's what's troubling me. We have a recent case that you may be familiar with, Genetics Institute against Novartis, in which we said, well, at least with respect to a product, in that case a compound, that the surprising results of the compound entitled the compound to the benefits of patentability, even if they weren't known at the time of the invention. Do you think that analysis would apply in this setting? No, Your Honor, because I don't think there are any unexpected results. I think Leibovitz was wrong. You think he was wrong, but what other evidence is there in the record to say that he wasn't wrong? I mean, there was nothing else in the record that said, at the time, anyone would have ever expected this sustained release to work to treat diabetes. So what the record shows, though, is Pfizer was pursuing it. Pfizer was pursuing it, even if they're correct that Pfizer and Alza collaborated on glucotrol in the early 1990s. Pfizer was pursuing it independently in the late 1980s. The Renaud patent was a sustained release dosage form, and gluposide was one of its preferred elements, and the Cortado patent is all about gluposide. So were they pursuing that as a person of ordinary skill in the art or as a person of extraordinary skill? I mean, they were pursuing it. I mean, we would look at this art and say one of ordinary skill in the art was doing it. I mean, I don't know why you would think that that was only extraordinary. Well, that's why I just don't know. I mean, the rubric is one of ordinary skill in the art, and yes, Pfizer looked to me like, and your reply review came back and said, well, Pfizer was at work on this problem before the collaboration with Alza, which undercuts the affidavit. But I just didn't know whether that was because Pfizer was operating as an ordinary skilled artist or whether they were really well beyond what one of ordinary skill would have been thinking. I don't think there's anything in the record to show that they were well beyond what anyone in this room. More that they were ordinary. Right, more that they were ordinary. And, you know, what Kaczynski is trying to say is that Pfizer was only pursuing this because it knew of Kaczynski's invention. But, again, that's not supported by the record because Pfizer was independently pursuing this. So if the Court has nothing further, then I will move on. Thank you very much. Mr. Lucci, rebuttal? Yes, Your Honor. Counsel for the Director said that Kortolo repeatedly teaches administration of these dosage forms. That's not correct. If it repeatedly taught subject matter of the claim, we would have an anticipation rejection. We have an obviousness rejection. What it talks about is the possibility of taking these dosage forms. Again, it's a broad delivery platform using lyotrophic crystals. And, yes, ultimately administering at least some of those drugs in these dosage forms to patients. It doesn't actually teach doing it for glipizide. Now, it is true that eight of the 11 laboratory examples are directed to glipizide. Interestingly, though, there's no claim reciting glipizide. Counsel mentions that there are claims to methods of treatment. Yes, those claims of methods of treatment are generic. Now, it's interesting that if there were such interest in glipizide that have that many experimental examples on the laboratory bench directed to glipizide. There was no attempt made to treat glipizide, to claim methods of treatment involving glipizide. That's consistent with misgivings about whether or not a controlled delivery form of glipizide would actually work in a patient and misgivings as to whether or not it would endanger a patient's health. Well, it's also consistent, I suppose, one could argue, with wanting to claim generically rather than specifically. It certainly is, Your Honor. It's equivocal at best, but it is consistent in the way of looking at it that if there was such interest in glipizide, there was no claim directed to it in spite of the many examples in the laboratory context. Now, counsel also mentioned that there's evidence that Pfizer was pursuing it. Well, that all begs the question of what was it. If it is a dosage form that involves lyotrophic crystals with glipizide, yes, they were pursuing it. There's evidence of that. That's Cortola. But what we have claimed here is not simply a dosage form. It's a method. And there's no evidence of record indicating that at the time of Mr. Kaczynski's invention, they were pursuing methods. The record is equivocal on this point. It's a possibility that they pursued it up to Cortola. They said, yeah, this is a nice laboratory system, but we better not put it into a patient. That's supported by the record as equally well as the idea that they were pursuing it and had an intention and eventually brought that to market as glucotrol. So there's no evidence of record of what Pfizer was doing or thinking at the relevant point in time. What we do have is the declaration of Dr. Leibovitz, which states, with fact-based testimony, that people skilled in the art didn't think the methods would work and, moreover, would endanger the health of a patient. Now, if I may, Your Honor, you had mentioned this hypothetical situation involving the syringe. If I might make a modification of it a bit to more closely match our facts, I believe you talked about a disclosure in the prior art of the claimed invention of something akin to the claimed invention. Well, the device. The prior art discloses the device, and I come in and I say, well, I'll convert the device into a method of treatment. And so method of treatment is efficaciously administering to a human a group of drugs through this syringe, and I want a patent. And the patent office is going to presumably say no, I would assume. At least at first blush you would think that they would, given the way they proceed with things. But the thing here to keep in mind is that in that conversion of the device into the method, if at the same time you had skepticism as to whether it worked and misgivings as to whether it would endanger the patient health, the unexpected result, as in our instance, is the fact that it does work. Council mentioned we don't have unexpected results. Well, yeah, we don't have test data of Mr. Corotolo's device tested against Mr. Kuczynski's device. We don't have that. But that's not the real difference between the devices. Well, there seems to be similarity, but we don't know how it actually performs in a patient. Things have been known to perform one way on a lab bench and not perform the same way in a patient. But what we have here is we have the unexpected result is the fact that contrary to the thinking of those in the art, the controlled release form of glipizide actually does work and does not diminish or jeopardize the health of the patient. That's the unexpected result. But that brings us back to the question of whether you get the benefit of an unexpected result that was not discovered at the time of the patent by the Patent Department. It's more than not discovered, Your Honor. It's not taught by Corotolo. But the question is, I mean, your invention is to take Corotolo and administer it to a person. Now, the question is, do you then get the benefit of being able to say, well, it was later discovered that it actually works better than any of us would have expected, and therefore we have a patent that's valid? Your Honor, I wouldn't concede that what we did was take Corotolo and put that into a patient. There seems to be some similarities there, but I wouldn't concede that the dosage form that was actually Okay, well, let's pass that issue of potential dispute and get to the question of whether you get the benefit of a later discovered special efficacy for the treatment. Your Honor, I believe in this particular context we do because it's not merely discovering something which is unexpected that it performs better. There was thinking in the field that it wouldn't work and it would endanger the health of a patient. And in both of those respects, that thinking was incorrect. That was what kept people, the record is consistent with this, it kept people from actually administering something of this type to patients. And we, contrary to thinking in the field, on both of those points, proceeded and developed a dosage form which actually does work and helps patients. So I believe under our particular facts, if you want to look at it, it's something ignoring. But what we had was surprising, it was unconventional, and that's supported by the record, whereas the director's position about obviousness in view of Corotolo is not supported. On the issue of Pfizer, how do you respond to the fact that even if you put aside the question of whether their ultimate embodiment was using your invention, there was the Ranaud patent beforehand? Well, I think the activities before, Your Honor, Ranaud is not anticipatory either. I think Ranaud is consistent with the idea that people were exploring controlled release dosage forms of various platforms, Ranaud being, I believe, a little different than Corotolo. People had long lists of drugs in which these could be used. People had played with them in the laboratory settings. But everything we've seen is consistent with having a misgiving about actually putting that into a patient. So I think Ranaud is consistent in that regard. Let me just spin out perhaps just to make sure I understand what your position is on this. Another hypothetical. Suppose that the prior art has discovered a particular compound which is extremely effective against a particular form of cancer, but it carries brutal side effects that, if administered to a person, would be expected to kill most of the people that are given it. But you're sitting in your lab and you're saying, well, I know that's what everybody thinks and everything that's been studied so far has come to that conclusion, but what the heck, let's go ahead and put in a patent application for this, a method of treatment using this particular compound. And if it turns out that it works better than everybody thinks, including me, that we'll have a great patent and you do that and you somehow get it through the patent office. And it turns out, much to your surprise and the surprise of everybody else, that the side effects are not as severe as everyone had expected. Do you get the benefit of that later discovery to make your patent valid over the prior art? Your Honor, I think there might be fact situations where you don't, and there probably are fact situations where you do. There are a number of things, even in your hypothetical, that I guess could be nailed down. The point you make about the extent to which the drug was suspected to be useful against cancer, it would depend on how forceful... Let's assume that it's absolutely undisputed. It's established that in the laboratory it is extremely effective against this particular tumor. Your Honor, I think then that would depend also on whether or not the inventor had a particular insight. You mentioned that... All he had, all the inventor had was to say, you know, let's go ahead and toss it in. It may turn out that this is better than any of us think, and if it does, we got a winner. Your Honor, I think if the record supports that the inventor is doing nothing more than taking a flyer and saying, what the hell, I think that that could be a position in which the unexpected results would not inure to his benefit. Okay. But the evidence of record in our case does not support that. Okay. Thank you, Mr. Lucci, Ms. Lynch. I thank both counsel, and the case is submitted.